**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| D.F.,<br><br>         Plaintiff,<br><br>v.<br><br>ORGANIZING FOR AMERICA, DNC<br>SERVICES CORPORATION, and<br>BRENDAN J. KILLACKEY,<br><br>         Defendants. | Civil Action No. 2:25-cv-05003 (GJP) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT DNC SERVICES CORPORATION'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 5

BACKGROUND ............................................................................................................. 5

    I.    Allegations About the Relationship between D.F. and Brendan Killackey. ..................... 6

    II.   D.F.'s Allegations Related to the DNC. .......................................................... 8

LEGAL STANDARD ...................................................................................................... 9

DISCUSSION .................................................................................................................. 10

    I.    The DNC Is Not Vicariously Liable for Killackey's Misconduct (Count III)................. 10

    II.   The Complaint Does Not State a Plausible Claim for Negligence (Counts I & III). ....... 11

        A.    The Complaint Does Not Allege Facts Showing the DNC Breached its Duty of
              Care in the Hiring, Retention, or Supervision of Killackey. ................................ 12

        B.    The Complaint Does Not State a Claim for Negligent Failure to Report Abuse.. 18

        C.    The Complaint Establishes No Other Special Duty Owed to the Plaintiff. .......... 20

    III.  Plaintiff Does Not State a Claim for Civil Conspiracy or Aiding-and-Abetting
        (Count II). .......................................................................................................... 22

CONCLUSION................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*Alfred M. Lutheran Distribs. v. A.P. Weilersvacher, Inc.*,
    650 A.2d 83 (Pa. Super. Ct. 1994) ...................................................... 18

*Anderson v. Adam's Mark Hotels & Resorts*,
    No. 99-1100, 2000 U.S. App. LEXIS 6949 (10th Cir. 2000) .................................... 15

*B.B. v. Methodist Church of Shelbina*,
    541 S.W.3d 644 (Mo. Ct. App. 2017) .................................................. 15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................... 9

*Connelly v. Lane Constr. Corp.*,
    809 F.3d 780 (3d Cir. 2016) ............................................................ 10

*Costa v. Roxborough Mem'l Hosp.*,
    708 A.2d 490 (Pa. Super. Ct. 1998) ................................................... 17

*D.R. v. Middle Bucks Area Vocational Tech. Sch.*,
    972 F.2d 1364 (3d Cir. 1992) .......................................................... 21

*D.T. v. Catholic Diocese of Kan. City-St. Joseph*,
    419 S.W.3d 143 (Mo. Ct. App. 2013) .................................................. 15

*Dempsey v. Walso Bureau, Inc.*,
    246 A.2d 418 (Pa. 1968) ........................................................... 16, 17

*Doe v. Abdulaziz Bin Fahd Alsaud*,
    12 F. Supp. 3d 674 (S.D.N.Y. 2014) .................................................. 18

*Doe v. Old Forge Borough*,
    No. 3:12-cv-2236, 2015 U.S. Dist. LEXIS 85902 (M.D. Pa. July 1, 2015) .................... 21

*Doe v. Pennsylvania State Univ.*,
    982 F. Supp. 2d 437 (E.D. Pa. 2013) .................................................. 10

*Doe v. Roman Catholic Archdiocese of St. Louis*,
    347 S.W.3d 588 (Mo. Ct. App. 2021) .................................................. 14

*Iqbal v. Ashcroft*,
    556 U.S. 662 (2008) ................................................................... 10

*J.D. v. Price*,
    No. 20-cv-749, 2020 U.S. Dist. LEXIS 261438 (W.D. Pa. Aug. 11, 2020) ............... 13, 15

*Jefferson v. Abbington Jefferson Hosp.*,
    No. 24-cv-4762, 2025 U.S. Dist. LEXIS 77820 (E.D. Pa. Apr. 24, 2025) ................... 12

*M.C. v. Harnad*,
    No. 21-cv-19819, 2025 U.S. Dist. LEXIS 76611 (D.N.J. Mar. 19, 2025) .................... 18

*M.S. v. Susquehanna Twp. Sch. Dist.*,
    43 F. Supp. 3d 412 (M.D. Pa. 2014) ................................................... 20

*Macon v. Braum's, Inc.*,
    No. 12-23-00083, 2023 Tex. App. LEXIS 9400 (Tex. App. Dec. 14, 2023) .................. 15

*Marfia v. Gettysburg Area Sch. Dist.*,
    No. 1:22-cv-02029, 2025 U.S. Dist. LEXIS 113762 (M.D. Pa. June 16, 2025)...................... 18
*Marion v. Bryn Mawr Tr. Co.*,
    288 A.3d 76 (Pa. 2023) ......................................................................................................... 22
*Martin v. Evans*,
    711 A.2d 458 (Pa. 1998) ....................................................................................................... 11
*McFerron v. L.R. Costanzo Co.*,
    No. 3:02-cv-1989, 2003 U.S. Dist. LEXIS 20791 (M.D. Pa. Sept. 10, 2003) ......................... 13
*N.S. v. Harnad*,
    No. 21-19820 JBD, 2025 U.S. Dist. LEXIS 34791 (D.N.J. Feb. 4, 2025) .............................. 15
*Olinger v. Zikeli*,
    43 Pa. D. & C.5th 387 (Pa. Lawrance Cnty. Ct. Com. Pl. 2014)...................................... 16, 17
*Papasan v. Allain*,
    478 U.S. 265 (1986)................................................................................................................. 9
*R.A. ex rel. N.A. v. First Church of Christ*,
    748 A.2d 692 (Pa. Super. Ct. 2000) ............................................................................ 10, 12, 13
*Sanchez by Rivera v. Montanez*,
    645 A.2d 383 (Pa. Commw. Ct. 1994) ................................................................................... 10
*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010)................................................................................................... 10
*Seeley v. St. Anthony's Catholic Church*,
    No. 12-CV-15, 2013 U.S. Dist. LEXIS 61788 (D. Wyo. Apr. 26, 2013) ................................. 15
*Thompson Coal Co. v. Pike Coal Co.*,
    412 A.2d 466 (Pa. 1979) ....................................................................................................... 22

**Statutes**
23 Pa. Cons. Stat. § 6311 ............................................................................................................. 19

**Other Authorities**
Restatement (Second) of Torts § 213
    (Am. L. Inst. 1965) ............................................................................................................... 12
Restatement (Second) of Torts § 317
    (Am. L. Inst. 1965) ............................................................................................................... 12

**Rules**
Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 10

## INTRODUCTION

Plaintiff D.F. ("D.F.") alleges that in 2012, when she was a 16-year-old volunteer for a political campaign, Defendant Brendan Killackey ("Killackey"), a 38-year-old campaign employee, befriended her and manipulated her into an unwanted sexual relationship. The complaint does not allege that abuse or sexual contact happened at campaign offices or any other location to which Killackey had access only because of his job, and it affirmatively states that D.F. did not tell anyone about the relationship at the time. The complaint asserts claims against Killackey for sexual assault, corruption of minors, assault, battery, and intentional infliction of emotional distress, along with negligence, conspiracy, and vicarious liability against DNC Services Corporation (the "DNC"), which the complaint alleges operated the office where D.F. volunteered.

The allegations against Killackey describe appalling behavior with tragic consequences. However, the complaint does not plausibly allege that the DNC knew or should have known that Killackey undertook this abuse. Absent plausible allegations of this type, the complaint does not state claims against the DNC for Killackey's misconduct, and so the Court should dismiss the claims against the DNC.

## BACKGROUND

The complaint in this case was filed on July 10, 2025, and Defendant DNC Services Corporation was served on July 15, 2025. Counsel for D.F. also attempted at that time to serve "Organizing for America" at the same address, but Organizing for America is not a legal entity and no service was effected. *See* Fed. Election Comm'n, *Candidate and Committee Profiles: Organizing for America*, https://www.fec.gov/data/search/?search=Organizing+for+America (last visited Aug. 27, 2025). Accepting all allegations as true for purposes of the present motion, the DNC moves to dismiss for failure to state a claim.

I.      **Allegations About the Relationship between D.F. and Brendan Killackey.**

The complaint alleges that in April 2012, while a "sixteen-year-old junior at Bristol Junior-Senior High School," D.F. signed up as an "Organizing Fellow" at an "Organizing for America" political campaign field office in Bristol, Pennsylvania. Complaint ¶¶ 16, 49–52, *D.F. v. Org. for Am.*, No. 2025-04943 (Pa. Bucks Co. Ct. Com. Pl. July 10, 2025) ("Compl."). On her second visit to the office, D.F. met Brendan Killackey, a 38-year-old "Field Operative." *Id.* ¶¶ 54–57. The complaint further alleges—upon information and belief—that Killackey "took an immediate and unusual interest" in D.F. and was "complimentary and flirtatious" "[i]n words or substance," and later "continued to vocalize and/or display his interest" in her. *Id.* ¶¶ 58–59, 63. The complaint then alleges—again upon information and belief—that, between April 2012 and June 2012, Killackey "began to pay an exorbitant amount of attention" to her, "took an interest" in her "daily life and her aspirations for the future," would "consistently compliment[] [her] appearance, intelligence, and/or interests," and engaged in "an effort to make [her] feel special." Compl. ¶¶ 77–80. Killackey's actions allegedly constituted grooming "for sexual exploitation and abuse." *Id.* ¶¶ 85–86.

The complaint then alleges that D.F.'s relationship with Killackey changed in late June 2012, when Killackey gave her a ride home from the campaign office. Compl. ¶ 87. During that car ride, D.F. first told Killackey that "she thought she may have a crush on him." *Id.* ¶ 89. Killackey then allegedly pulled the car over and began "touching" D.F. and "rubbing" her leg "without her consent." *Id.* ¶¶ 90–92. Two weeks later, D.F. allegedly texted Killackey for a ride home from a party with her friends, after which he picked her up and "drove to the next town, . . . parked near a basketball court, and initiated heavy touching and kissing without [her] permission." *Id.* ¶¶ 98–101.

The complaint next alleges that in July 2012, Killackey "brought [D.F.] to his apartment" after work and "proceeded to initiate sexual intercourse." Compl. ¶¶ 102–05. The complaint alleges that a "sexually abusive relationship" between Killackey and D.F. then "continued throughout the campaign over the summer and into the school year." *Id.* ¶ 115; *see also id.* ¶¶ 106–14, 118–28, 130–35, 137 (describing several encounters in which Killackey allegedly received limited or no consent). In each case, the alleged sexual activity occurred "in private," in Killackey's car, at Killackey's apartment, or at public parks. *Id.* ¶¶ 101–02, 118, 132, 137.

The complaint acknowledges that during this period, Killackey "repeatedly swore [D.F.] to secrecy about their relationship." Compl. ¶ 139. As a result, the complaint concedes that D.F. "did not directly reveal the nature of her relationship" with Killackey to the DNC, staff at the Bristol field office, or her school. *Id.* ¶ 140. This secrecy accords with the complaint's description of grooming, which typically includes "isolating" a victim "from potential protectors" and "concealment of the abuse." *Id.* ¶¶ 1–2. Years later, D.F. allegedly wrote to Killackey, "I deeply regret that I didn't tell anyone while it was happening who could have helped me." *Id.* ¶ 160.

According to the complaint, Killackey and D.F. "ceased contact for a period of time" following the 2012 presidential election, although Killackey's "sexual abuse" of D.F. then restarted and "continued" until "May 2013." Compl. ¶¶ 150–53. The complaint then alleges that Killackey and D.F. renewed intimate contact once D.F. had turned age eighteen—in her first week after leaving home for college—and had additional contact at age twenty and twenty-four. *See* Compl. ¶¶ 157–62. The complaint contains no allegations regarding the DNC during this period of renewed contact.

## II.    D.F.'s Allegations Related to the DNC.

The heart of the complaint's allegations against the DNC is that other staff at the field office where D.F. volunteered "knew or should have known" that Killackey "was engaging Plaintiff D.F., a minor, in an inappropriate, intimate, sexual, abusive, manipulative, and/or exploitative relationship." Compl. ¶ 146; *see also id.* ¶¶ 5–6, 154–55 (similar). But the complaint alleges few, if any, facts that might substantiate this general allegation, particularly in light of concessions regarding the privacy and secrecy under which Killackey undertook the alleged abuse. *See id.* ¶¶ 101–02, 118, 132, 137, 139–40, 160.

As a starting point, the complaint does not assert that the DNC had direct knowledge of Killackey's alleged misconduct. To the contrary, the complaint affirmatively alleges that D.F. did not tell anyone about her relationship with Killackey. Compl. ¶¶ 140, 160. Likewise, the complaint does not allege that Killackey told anyone about their relationship or that anyone else observed the allegedly abusive conduct. *See, e.g., id.* ¶¶ 138–40. The complaint does not allege that D.F. received special treatment at work; in fact, it concedes that her "campaign responsibilities did *not* change substantially as a result of her sexually abusive and illicit relationship" with Killackey. *Id.* ¶ 142 (emphasis added). Other allegations that might have raised the suspicions of staff at the Bristol office are similarly absent. The complaint does not allege that the alleged abuse occurred during or after work social events involving campaign staff, or that Killackey made sexual comments or physically touched her in front of Bristol staff. *Cf. id.* ¶¶ 1–2 (describing "typical[]" and "inappropriate" grooming behaviors). Nor does the complaint allege how actions or behaviors staff observed would have led a reasonable person to conclude that Killackey was abusing D.F.

The complaint rests its claim against the DNC on the allegation that Killackey brought D.F. into the "inner circle" of the Bristol office (*i.e.*, the field directors and organizers) and that those

individuals—upon information and belief—"witnessed [Killackey's] palpable interest in and behavior towards" D.F. Compl. ¶¶ 144–45, 184. The complaint does not elaborate on what it meant to be a part of the inner circle, what specific behavior Killackey displayed in front of his peers, or whether any other volunteers became part of the inner circle. Even the allegation that Killackey was "openly complimentary and flirtatious" with D.F. upon their initial meeting, *id.* ¶ 58, does not extend to this later period, *see id.* ¶¶ 138–55. The remaining allegations about the DNC's knowledge are conclusions that the DNC "knew or should have known" about Killackey's alleged misconduct, *id.* ¶¶ 5–6, 146, 154–55, 185, or that the DNC "acted in concert" with Killackey to "conceal his sexually exploitive conduct," *id.* ¶¶ 147, 186–87. Within the negligence cause of action, the complaint also contains an additional list of thirty-nine alleged possible failures by DNC. *See* Compl. ¶ 173(a)–(mm) (accusing the DNC of "one or more of the following acts and/or omissions."). But the complaint likewise alleges no facts to support any of those conclusions, many of which have no relation to the preceding factual allegations.

Accepting the complaint as true, Killackey's conduct was outrageous and morally offensive. However, the complaint does not allege facts showing that the DNC should have detected that misconduct and stopped it. The DNC therefore moves to dismiss all claims against it.

## LEGAL STANDARD

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6), where it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While courts must view a complaint in the light most favorable to the plaintiff, they need not accept legal conclusions as factual allegations. *See id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Instead, "[f]actual allegations must be

enough to raise a right to relief above the speculative level." *Id.*; *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (framing as a three-part test). The plausibility standard is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2008); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (requiring "more than a sheer possibility that a defendant has acted unlawfully.").

## DISCUSSION

The complaint alleges three causes of action against the DNC. We first briefly address the claim for vicarious liability and then turn to the core negligence claim. Finally, we discuss why the joint conspiracy and aiding-and-abetting claim fails for similar reasons.

## I.    The DNC Is Not Vicariously Liable for Killackey's Misconduct (Count III).

Under the facts alleged, Killackey's misconduct was grave and inexcusable. However, the DNC is not vicariously liable for Killackey's egregious acts, even taking the allegations to be true. *Cf.* Compl. ¶ 201 (asserting that the DNC is vicariously liable for Killackey's actions). Vicarious liability of employers exists solely for conduct taken within the scope of an employee's duties, and Pennsylvania courts "have consistently held that sexual abuse of minors falls outside an employee's scope of employment." *Doe v. Pennsylvania State Univ.*, 982 F. Supp. 2d 437, 442 (E.D. Pa. 2013) (explaining that "such acts of abuse are not of the kind and nature [an abuser] was employed to perform and not for the employer's benefit."); *see also, e.g.*, *Sanchez by Rivera v. Montanez*, 645 A.2d 383, 391 (Pa. Commw. Ct. 1994) (holding that sexual abuse is not within the scope of employment); *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 700 (Pa. Super. Ct. 2000) (same). The abuse alleged here was outside Killackey's employment and cannot form the predicate for vicarious liability.

To be clear, employers maintain a duty of care that relates to certain employee acts *outside* the scope of employment. But that duty sounds in negligence, and as we discuss below, the complaint does not allege facts adequate to state a plausible breach by the DNC. Similarly, to the extent that the complaint alleges that the DNC is vicariously liable for the alleged negligence of *other campaign staff* in "fail[ing] to take reasonable steps and fail[ing] to implement reasonable safeguards to avoid acts of sexual assault," Compl. ¶ 199, such a claim fails for the same reason that the complaint has not alleged a plausible negligence claim against the DNC directly. *See infra.* Section II.

## II.     The Complaint Does Not State a Plausible Claim for Negligence (Counts I & III).

Turning then to negligence, this claim fails because the complaint does not state facts to support an allegation that the DNC or campaign staff should have suspected or been aware of Killackey's alleged misconduct. As we discuss below, the complaint alleges only two recognized duties owed here—a duty to hire, supervise, and retain employees with care and a duty to report suspected child abuse—and the lack of plausible notice precludes a violation of either. In addition, the negligent hiring, supervision, and retention claim also fails for the independent reason that no alleged abuse happened in Killackey's workplace, in another location Killackey could access only because of his employment, or using his employer's property.

A claim for negligence under Pennsylvania law must allege facts that show that "the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998). At issue here are the first two of these elements: the duty that the DNC or campaign staff owed and whether the complaint alleges a plausible breach of that duty.

As to the duty owed, the complaint lists a broad range of would-be duties that the DNC owed and allegedly broke here, many with little connection to the underlying facts alleged. *See* Compl. ¶¶ 167, 169–72. Such shotgun pleading is strongly disfavored. *See, e.g., Jefferson v. Abbington Jefferson Hosp.*, No. 24-cv-4762, 2025 U.S. Dist. LEXIS 77820, at *3–5 (E.D. Pa. Apr. 24, 2025) (dismissing case). But taking that list in its best light, the allegations divide into two general categories. First is the duty that an employer owes to the public (including to other employees or volunteers) to hire, supervise, and retain employees with care. *See, e.g.,* Compl. ¶ 172. Second is a special duty that individuals who work with children owe to those children to report child abuse. *See, e.g., id*. ¶ 171. Because the alleged abuse happened outside the workplace and was not plausibly alleged to be reasonably knowable to others in the workplace, the complaint fails to plead a breach of these duties.

### A.    The Complaint Does Not Allege Facts Showing the DNC Breached its Duty of Care in the Hiring, Retention, or Supervision of Killackey.

An employer faces liability for an employee's conduct outside of his or her duties only when a failure to take reasonable care in hiring, supervising, or retaining that employee causes the alleged harm. Pennsylvania courts apply the framework articulated in Section 317 of the Restatement (Second) of Torts. *See R.A. ex rel. N.A.*, 748 A.2d at 697 (explaining that Section 317 "restate[s] the existing tort law of Pennsylvania."). (Some Pennsylvania courts also rely on Section 213 of the Restatement (Second) of Agency, which imposes the same substantive requirements. *See, e.g.*, Restatement (Second) of Torts § 213 (Am. L. Inst. 1965); *R.A. ex rel. N.A.*, 748 A.2d at 697.) Under this standard, liability attaches only when two conditions are met. *First*, the employee must be "upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant," or "using a chattel of the master." Restatement (Second) of Torts § 317 (Am. L. Inst. 1965). *Second*, the employer must both "know[] or have reason to know that he has

the ability to control his servant" and "know[] or should know of the necessity and opportunity for exercising such control." *Id.* These limitations are necessary because "[e]mployers cannot be expected to constantly monitor and control the activities of employees who are not on work premises and are not engaged in the scope of their employment." *J.D. v. Price*, No. 20-cv-749, 2020 U.S. Dist. LEXIS 261438, at *10 (W.D. Pa. Aug. 11, 2020).

The allegations do not satisfy either prong. As explained below, Killackey's alleged abuse of D.F. took place in his car, in his apartment, in public parks, or "in private," Compl. ¶¶ 101–02, 118, 132, 137, and the complaint fails to plausibly allege that the DNC or campaign staff should have known or expected it.

### 1. The Alleged Abuse Did Not Occur in Locations Related to Killackey's Employment.

The negligent hiring, retention, or supervision claim fails at the outset because none of the alleged abusive acts happened at the campaign office, in locations to which Killackey only had access due to his employment, or using campaign property. Pennsylvania courts apply this premises or property requirement even to serious wrongdoing. Thus, for example, in *R.A. ex rel. N.A.*, a court found that a minister's sexual assault on a minor did not give rise to employer negligence because "the Church can have no liability under § 317 for failing to exercise reasonable care to control [the Minister] so as to prevent him from intentionally causing bodily harm to [the minor] because none of the harm was caused on Church premises or on premises to which he gained admittance only as a Church employee." 748 A.2d at 699; *see also, e.g.*, *McFerron v. L.R. Costanzo Co.*, No. 3:02-cv-1989, 2003 U.S. Dist. LEXIS 20791, at *17 (M.D. Pa. Sept. 10, 2003) ("The first alleged sexual assault, falls outside of the negligence theory of liability as it did not occur on the Defendant['s] premises.").

Here, the complaint asserts that all alleged abusive acts happened away from the campaign office or any other location to which Killackey had access due to his employment. *See* Compl. ¶¶ 88, 101 (in Killackey's car); *id.* ¶¶ 102, 132 (in Killackey's apartment); *id.* ¶ 137 (in public parks). An employer cannot be found negligent for failure to control an employee in his own home or at a public location chosen for seclusion. So, the negligent hiring, retention, or supervision claim fails.

Further, allegations that Killackey "groom[ed]" D.F. on campaign premises, Compl. ¶ 3, are insufficient to satisfy the premises or property requirement. Nothing that allegedly happened at the office was itself abusive, and if not for Killackey's alleged bad intentions, that conduct would not have harmed D.F. *See, e.g.,* Compl. ¶¶ 58, 77–82 (allegations—all upon information and belief—that Killackey was "complimentary and flirtatious," showed "attention" to D.F., expressed interest in her "daily life and aspirations," and complimented her "appearance, intelligence, and/or interests."). The complaint does not even allege that Killackey physically touched her— appropriately or inappropriately—at the office. *Cf. id.* ¶ 2 (describing "desensitization to sexual content and touch" as a "key stage[] to grooming."). These allegations do not satisfy the premises or property requirement.

Courts in other states have applied this framework to confirm that grooming activities alone cannot satisfy the premises or property requirement. For instance, Missouri courts have consistently rejected negligence claims based on grooming activities at a place of employment. *See Doe v. Roman Catholic Archdiocese of St. Louis*, 347 S.W.3d 588, 592 (Mo. Ct. App. 2021) (rejecting argument that "sexual abuse is inseparable from the grooming" and holding that the premises or property requirement could only be met where the "acts of abuse" took place at the place of employment); *D.T. v. Catholic Diocese of Kan. City-St. Joseph*, 419 S.W.3d 143, 151 (Mo.

14

Ct. App. 2013) (holding that premises or property requirement was not met when abuser would "approach [plaintiff] at school, put a hand on his shoulder, and ask how his family was doing [and]; would ask [plaintiff] to help him with audio-visual presentations."); *B.B. v. Methodist Church of Shelbina*, 541 S.W.3d 644, 659 (Mo. Ct. App. 2017) (holding that on-premises grooming could not be used to satisfy the premises requirement). Courts in other contexts have likewise found allegations of grooming on premises insufficient to support liability. *See, e.g.*, *N.S. v. Harnad*, No. 21-19820 JBD, 2025 U.S. Dist. LEXIS 34791, at \*38 (D.N.J. Feb. 4, 2025) (finding that on-campus grooming allegations did not support liability); *Seeley v. St. Anthony's Catholic Church,* No. 12-CV-15, 2013 U.S. Dist. LEXIS 61788, at \*17–18 (D. Wyo. Apr. 26, 2013) (finding no liability for employer when employee allegedly abused a woman whom he allegedly groomed during counseling); *Macon v. Braum's, Inc.*, No. 12-23-00083, 2023 Tex. App. LEXIS 9400, at \*23–25 (Tex. Ct. App. Dec. 14, 2023) (finding no liability for employer where sexual assailant allegedly groomed 16-year-old victim while at work).

This is consistent with the general principle that the premises or property requirement must be strictly construed. *See J.D.*, 2020 U.S. Dist. LEXIS 261438, at \*9 (dismissing complaint based on deficient premises allegations where employee committed sexual assault while traveling for work by commercial plane); *see also Anderson v. Adam's Mark Hotels & Resorts*, No. 99-1100, 2000 U.S. App. LEXIS 6949, at \*7 (10th Cir. 2000) (affirming dismissal of negligent supervision claim where hotel employee sexually assaulted another employee during off hours in a room at the hotel that he had privately reserved). Once again, the complaint does not allege abuse in the campaign office, in locations to which Killackey only had access due to his employment, or using campaign property. Because grooming alone cannot satisfy the premises or property requirement, the negligent hiring, retention, and supervision claim fails.

15

**2.    The Plaintiff Does Not Plausibly Allege That the DNC Had Actual Knowledge or "Reason to Know" That Killackey Posed a Risk to D.F.**

Even if the complaint contained allegations that would satisfy the premises or property requirement, the claim of negligent hiring, supervision, and retention fails because the complaint does not allege facts to support boilerplate allegations that the DNC "knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of" Killackey. *See Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 422 (Pa. 1968). Said another way, the complaint does not allege facts sufficient to conclude, even in the most favorable light, that the DNC or campaign staff were aware or should have been aware that "a foreseeable harm would eventually befall" D.F. *Olinger v. Zikeli*, 43 Pa. D. & C.5th 387, 398 (Pa. Lawrance Cnty. Ct. Com. Pl. 2014).

As an initial matter, the complaint does not attempt to establish negligence by alleging that the DNC or campaign staff *actually* knew of the risk Killackey posed or harm he caused. To the contrary, the complaint concedes that D.F. told no one about her relationship with Killackey at the time, and that the DNC failed "to discover" Killackey's sexual abuse of D.F. Compl. ¶¶ 139–40, 160, 173(g).

Instead, the complaint argues that the DNC "should have known" that Killackey posed a risk to D.F. and was abusing her, *id.* ¶¶ 5–6, 146, 154–55, 173, but does not allege facts that support that conclusory allegation. The complaint alleges that the DNC "[f]ail[ed] to properly and adequately vet and/or screen" Killackey, Compl. ¶ 173(l), "[f]ail[ed] to appreciate and recognize that prior complaints clearly show [Killackey's] incompetence, lack of professionalism, and/or sexually inappropriate conduct," *id.* ¶ 173(w), and "[f]ail[ed] to recognize [Killackey's] propensity for abuse and sexual abuse of employees," *id.* ¶ 173(z). But it alleges no facts to support those conclusions—no facts about the hiring process, no facts about prior complaints, and no facts about Killackey's interactions with individuals other than D.F. Indeed, the complaint here makes such

16

extensive use of generic boilerplate allegations that it includes allegations apparently copied and pasted from another matter. *See* Compl. ¶ 199 (alleging the DNC did not "have in place a system or procedure to supervise and/or monitor the student-residents in their care at their football camp."). Conclusions alone do not state a claim for relief.

All that remains is an allegation that the DNC or campaign staff should have known the risk Killackey posed based on his alleged actions at the Bristol campaign offices. But the facts alleged about actions and behaviors at the office are insufficient to support a plausible allegation that the DNC should have known Killackey would be abusive. Once again, the most notable allegations are that Killackey "was openly complimentary and flirtatious" upon first meeting D.F. and that he later brought her into the "inner circle," where other employees witnessed "palpable interest in" D.F. and other undefined "behavior towards" her. Compl. ¶¶ 58, 143, 145. These vague alleged facts would not put an employer or supervisor on notice of a "foreseeable harm," *Olinger*, 43 Pa. D. & C.5th at 398, and do not support a claim here.

Courts examining far more substantial warning signs have found that they do not support claims of negligent supervision or retention. The seminal case in Pennsylvania is *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418 at 422, in which one employee regularly would "grab and push [other] employees in 'horse-play,'" "jabbed" individuals with his night stick on multiple occasions, and acted out physically with customers and staff. When that employee later committed assault while at work, his victim sued the employer for negligence and lost. The Pennsylvania Supreme Court held that prior aggressive acts by the employee were insufficient to suggest the employer should have known of the risk of assault. *Id.*; *see also Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 496 (Pa. Super. Ct. 1998) (a prior conviction for retail theft and "two to three reports" about employee's "erratic" behavior were not sufficient to put employer on notice of propensity commit

assault); *Doe v. Abdulaziz Bin Fahd Alsaud*, 12 F. Supp. 3d 674, 681 (S.D.N.Y. 2014) ("[P]rior misconduct . . . must be of the same kind that caused the injury; general, unrelated or lesser allegations of prior wrongdoing are insufficient.") (collecting cases). In a recent case, a school district was found not to be liable for negligence related to teacher-student abuse because the asserted warning signs—that the teacher "ha[d] favorites," brought the student to his class and held his hand, was allegedly "too friendly with students," "hugged students in front of the class," and invited students to "stay at his home"—were "too attenuated" from the ultimate abuse. *Marfia v. Gettysburg Area Sch. Dist.*, No. 1:22-cv-02029, 2025 U.S. Dist. LEXIS 113762, at *12, *43–46 (M.D. Pa. June 16, 2025); *see also M.C. v. Harnad*, No. 21-cv-19819, 2025 U.S. Dist. LEXIS 76611, at *20 (D.N.J. Mar. 19, 2025) (recognizing that certain "grooming behaviors . . . could easily 'seem normal or even caring to outsiders.'").

Here, the conduct that campaign leaders are alleged to have seen was not abusive. The complaint does not allege facts that lend plausibility to the conclusory allegation that the DNC or campaign staff should have known that Killackey would abuse or was abusing D.F. The complaint therefore does not state a claim for negligent hiring, supervision, or retention.

## B.    The Complaint Does Not State a Claim for Negligent Failure to Report Abuse.

The allegations also fail to state a claim against the DNC for negligence based on a failure to report child abuse. Pennsylvania law imposes on certain adults the obligation to report abuse in certain circumstances, and a failure to comply also sounds in negligence. Because the obligation is imposed by statute, a failure to comply is negligence *per se*, and therefore a breach of the duty of care owed to the children the law is intended to protect. *See, e.g., Alfred M. Lutheran Distribs. v. A.P. Weilersvacher, Inc.*, 650 A.2d 83, 91 (Pa. Super. Ct. 1994).

Here, the statute that imposes that duty is the Pennsylvania Child Protective Services Law ("CPSL"), 23 Pa. Cons. Stat. § 6311(a)(7), (b)(1)(i), which provides in pertinent part:

(a) Mandated reporters. The following adults shall make a report of suspected child abuse . . . if the person has reasonable cause to suspect that a child is a victim of child abuse:

(7) An individual paid or unpaid, who, on the basis of the individual's role as an integral part of a regularly scheduled program, activity or service, . . . has direct contact with children.

(b) Basis to report.

(1) A mandated reporter . . . shall make a report of suspected child abuse . . . if the mandated reporter has reasonable cause to suspect that a child is a victim of child abuse under any of the following circumstances:

(i) The mandated reporter comes into contact with the child in the course of employment, occupation and practice of a profession or through a regularly scheduled program, activity or service.

The complaint alleges that supervisors at the campaign office were mandatory reporters under this statute and that they suspected child abuse but failed to report it. Compl. ¶¶ 41–45; *see also* Compl. ¶ 173(ii)–(ll). As an initial matter, the statute applies to "adults," not entities, so it does not impose a reporting obligation on the DNC itself. Even under a vicarious liability theory, however, the complaint fails to allege facts needed for conclusory allegations to be plausible.

In short, the complaint does not state a claim for failure to report child abuse for the same reason that it does not state a claim for any other negligence: it does not allege facts to support knowledge or foreseeability. Section 6311 provides that, to allege a negligent breach, a complaint must identify an individual who had "reasonable cause to suspect" that the plaintiff was subject to abuse. 23 Pa. Cons. Stat. § 6311(a)–(b). The complaint here doesn't offer factual allegations to that end, only boilerplate conclusions.

Given the gravity of accusing an individual of child abuse, the "reasonable cause to suspect" standard is even more demanding than the standard for negligent hiring, retention, or

supervision, requiring specific facts to support an inference of abuse. For example, in *M.S. v. Susquehanna Twp. Sch. Dist.*, a student alleged that school officials negligently failed to report suspected sexual abuse by the school assistant principal, but the court granted a motion to dismiss. 43 F. Supp. 3d 412, 432–34 (M.D. Pa. 2014). The student specifically alleged that multiple staff members were aware that the assistant principal had pulled the student from class "an inordinate amount of times" and that the student's classmates accused her of "having a sexual relationship" with the assistant principal. *Id.* at 431–32. The court nonetheless held that the complaint failed to establish a duty to report because the "vague allegations are still insufficient" to necessitate reporting. *Id.*

For all of the reasons previously discussed, the complaint does not establish that any of the leaders of the campaign had "reasonable cause to suspect" child abuse. *See supra* Section II.A.2. The complaint specifically alleges that D.F. kept the relationship secret and that her job responsibilities never changed as a result of the relationship. She alleges no physical touching in the workplace, let alone abusive conduct. What she does allege—*e.g.*, that that Killackey was "openly complimentary and flirtatious" upon first meeting her—cannot create an implication that any individual had "reasonable cause to suspect" child abuse. Compl. ¶¶ 58, 180. The complaint therefore also does not state a claim for negligent failure to report child abuse.

### C.    The Complaint Establishes No Other Special Duty Owed to the Plaintiff.

Finally, although the complaint includes a wide range of general statements asserting that "one or more" other failures by the DNC caused the harm Killackey allegedly inflicted on her, Compl. ¶ 173, the complaint articulates no other special duty owed that might support a general claim that the DNC or campaign staff should have done more. The law does contemplate unique situations where actors—usually the state—act *in loco parentis* for a child and are broadly

responsible for the child's well-being. *See, e.g., D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1371 (3d Cir. 1992) (addressing prisoners and the "involuntarily commit[ed]"). But political organizations that engage high school students as part-time volunteers do not take on those broad responsibilities. And this makes sense: the law asks employers to take responsibility for foreseeable acts by employees on premises and further asks adults who work with minors to report suspected abuse. Requiring more would likely lead many risk-averse organizations to exclude students from engagement entirely, causing more harm than good.

Nor does the law create a special obligation to institute policies and training to educate employees that sexual abuse of minors is unacceptable. *See Doe v. Old Forge Borough*, No. 3:12-cv-2236, 2015 U.S. Dist. LEXIS 85902, at *34 (M.D. Pa. July 1, 2015). In *Doe*, a 15-year-old alleged abuse by police officers and argued that the police department had been negligent by failing to put in place better policies and training. *Id.* The court rejected that theory, finding that it "borders on the unreal" to suggest that "a more rigorous program to train police officers in proper contact with minors" would have prevented sexual abuse. *Id.* The court noted that "[t]he sexual abuse of minors is beyond question a serious criminal offense and there can be no serious argument that any person . . . is unaware of the criminality of this behavior." *Id.*

Taking the allegations here as true, a training directing staff not to sexually abuse teenage volunteers would not have stopped Killackey. As alleged, Killackey's conduct was abhorrent, and he knew others would condemn his actions if they were aware of them. *See* Compl. ¶ 138 (alleging that Killackey "believed other people would not understand how he 'felt' about" D.F.). So even setting aside the absence of specific allegations addressing training or policies, any theory based on such insufficient employee training does not state a claim for negligence.

### III.    Plaintiff Does Not State a Claim for Civil Conspiracy or Aiding-and-Abetting (Count II).

As a final matter, the combined claim for civil conspiracy and aiding-and-abetting should be dismissed both for failure to allege the intentionality required and for the same reasons the negligence claim fails. Civil conspiracy requires that "two or more persons combined or agreed with intent to do an unlawful act." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). Likewise, to aid and abet the commission of a tort, the defendant must have "actual knowledge" of the tort or, in some instances, "willful blindness" of it. *Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 81 n.3 (Pa. 2023). But for all of the reasons discussed above, the complaint does not allege facts to show even knowledge of Killackey's alleged misconduct, let alone "willful blindness" or an intent to advance his ends. As previously discussed, the complaint specifically alleges that D.F. withheld information regarding the alleged abuse from her colleagues and others who might have protected her. *See e.g.*, Compl. ¶¶ 140, 160. Accordingly, the plaintiff's claims for civil conspiracy and aiding and abetting should be dismissed as well.

*        *        *

The complaint in this case alleges that Brendan Killackey engaged in a horrific pattern of sexual abuse against a high school student he had met at the campaign office where he worked. The Democratic Party condemns the abuse of minors in the strongest terms and stands with all survivors of sexual abuse. In this case, however, the complaint does not allege facts that would have given the DNC the foreseeability or knowledge needed to put a stop to Killackey's alleged abuse and to alert appropriate officials.

### CONCLUSION

For the reasons set out above, the Court should dismiss the claims against the DNC.

22

Dated: September 3, 2025

**RESPECTFULLY SUBMITTED,**

_s/ Walter E. Anderson_
Walter E. Anderson (PA ID 204396)
Amy E. Richardson (_admitted pro hac vice_)
Jared P. Marx (_admitted pro hac vice_)
Grace H. Wynn (_admitted pro hac vice_)
HWG LLP
1919 M St. NW, 8th Floor
Washington, D.C. 20036
Tel.: (202) 730-1328
Fax.: (202) 730-1301
wanderson@hwglaw.com
arichardson@hwglaw.com
jmarx@hwglaw.com
gwynn@hwglaw.com

_Counsel for Defendant DNC Services_
_Corporation_